## The Inhabitants of the FIRST PARISH IN SUDBURY *versus* THOMAS STEARNS.

An action of trover or replevin may be maintained in the name of a parish, for the recovery of the parish records.

Under Revised Stat. *c.* 20, no person can become a member of a parish without its consent.

Any person wishing to become a member of a parish, must express his desire in writing, and the parish, by a direct vote or by the act of an authorized agent, must accede to the application, in order to constitute him a member.

It is not a valid objection to an election, that illegal votes were received, if they did not change the majority.

Several illegal voters having been permitted to vote at a parish meeting, in the election of officers, many of the legal voters protested against the proceeding and withdrew without voting ; but the persons declared to be elected having received the votes of a majority of the legal voters who remained and voted, it was *held*, that they were duly elected.

TROVER for the book of records of the First Parish in Sudbury.

At the term of the Court of Common Pleas to which the writ was returnable, the defendant filed a motion that the action be dismissed, on the ground that the counsel for the plaintiffs had no authority to appear and prosecute it in their name. At the April term, 1838, of this Court, the motion was renewed ; and upon the trial, before *Wilde* J., the following facts were shown.

In the spring of 1836, the First Parish was duly organized, having previously transacted their business in town meetings, without any organization separate from that of the town of Sudbury.

On the 27th of March, 1837, a legal meeting of the parish was held, for the choice of officers. Previous to the meeting and on the day thereof, sixty-three individuals, inhabitants of Sudbury, some of whom had, in years past, *signed off* from the parish, filed with Nahum Thompson, then the clerk of the parish, a certificate, dated the 22d of March, requesting to have their names enrolled as members of the parish, and expressing their desire to become members. None of these individuals belonged to any other religious society. The parish had at that time made no by-laws regulating the admission of members. At this meeting most of the sixty-three persons

were present.  The meeting was opened by the clerk, who presided during the choice of moderator ; and after he had received a part of the votes for moderator, several legal voters made objections to his receiving votes from any of the sixty-three persons who had thus filed their certificates, contending that they were not legal voters ; but the clerk permitted such of them as chose, to vote.  Independently of these sixty three persons, there were one hundred and twenty-eight members of the parish, of whom one hundred and one were present at the meeting.  Of this last number, between forty and fifty voted for John Hunt as moderator, and from eight to twelve, for some other person ; and the rest did not vote.  Hunt was declared by the clerk to be chosen moderator.  Eight members of the parish then objected to the proceedings of the meeting, and left the house, stating that there were persons present and voting, who did not belong to the parish.  The defendant, who was a member of the parish, was then chosen clerk, having all the votes but one ; and there were one hundred and one votes for clerk.  There were also chosen three parish assessors, a collector and treasurer, and a prudential committee.  All the officers thus chosen were members of the parish.

After the choice of the clerk, fifty members of the parish withdrew from the meeting, and held a meeting at a public house, and chose a moderator and a clerk ; and likewise a committee to take advice respecting the rights of the parish.

In April 1837, ten members of the parish (being of the party which withdrew, as above mentioned) applied to Warren Nixon, a justice of the peace, to call a parish meeting for the choice of officers for the year then ensuing ; five of these members having previously applied to the old assessors of the parish to call a meeting, which they refused to do, on the ground that the parish had held their annual meeting and chosen their officers.  Nixon granted a warrant, and a meeting was called, which was held on the 28th of April, and parish officers were then chosen.  In February 1838, a meeting was held, which was called by Nixon upon a like application to him by ten members of the parish.  At these meetings committees were appointed to demand of the defendant the parish records, and to institute a suit for them in case it should be necessary.

First Parish in Sudbury *v.* Stearns.

Before the commencement of this action a demand was made on the defendant accordingly, for the records, and he refused to deliver them up. The counsel for the plaintiffs was employed by the committee chosen at the last meeting.

The defendant was reëlected clerk on the 10th of March, 1838, at a meeting called by the assessors chosen on the 27th of March, 1837.

At a meeting on the 9th of April, 1838, which was called by assessors chosen at the meeting held on the 10th of March preceding, it was voted that the present suit " having been brought without the knowledge or consent of said parish, the parish direct that no further proceedings be had in the same, but request that the same may be dismissed, and do hereby consent that a nonsuit may be entered."

*Jan. 25th, 1839, at Boston.*

*Farley,* for the plaintiffs, contended that the sixty-three persons who filed their certificates with the clerk, could not become members of the parish without its assent ; St. 1834 c. 183, § 2, 3 ; Revised Stat. c. 20, § 4 ; *Leavitt* v. *Truair,* 13 Pick. 113 ; and that as they were allowed to vote at the meeting on the 27th of March, 1837, notwithstanding the protest of many of the members, the election of the officers then chosen could not be sustained. *First Parish in Sutton* v. *Cole,* 3 Pick. 243. It would seem to be a reasonable rule, that if the illegal voters are so numerous that they may change the majority, the election shall be void ; since it would often be impossible to ascertain how the election is affected by their votes.

*Choate* and *Keyes,* for the defendant, contended that as this was the *first* parish, and as it had made no by-laws respecting the admission of members, the sixty-three persons were members and entitled to vote ; *Oakes* v. *Hill,* 10 Pick. 333 ; *Osgood* v. *Bradley,* 7 Greenl. 411 ; that if they were not members, still the officers were legally elected at the meeting on the 27th of March, 1837, because they received the votes of a majority of the members who actually voted ; *Ex parte Murphy,* 7 Cowen, 153 ; *First Parish in Sutton* v. *Cole,* 3 Pick. 243 ; Angell & Ames on Corp. 72, 73 ; Cushing's Contested Elections, 130, 241 ; 5 Dane's Abr. 149 ; *Oldknow* v. *Wainwright,* 1 W. Bl. 229 ; *Rex* v. *Foxcroft,* 2 Burr

1017 ; and that supposing the defendant's election to be inef- <span>First Parish</span> fectual, the action could not be maintained against him in the <span>in Sudbury</span> name of the parish, but the person legally chosen clerk should <span>Stearns.</span> have demanded the records and, upon a refusal, should have applied for a mandamus to recover them. *Commonwealth* v. *Athearn*, 3 Mass R. 287 ; *Trustees of Vernon* v. *Hills*, 6 Cowen, 23.

MORTON J. delivered the opinion of the Court. We have <span>*Jan.* 30*th,*</span> no doubt that either trover or replevin will lie in this case. <span>1839.</span> *Sawyer* v. *Baldwin*, 11 Pick. 492. The property of the records is in the parish. The clerk is the officer designated by law to hold and keep them ; and if any stranger gets possession of them, the parish may take them from him by the proper action, or recover damage for their destruction or detention. A mandamus would doubtless be a more appropriate and effectual remedy to compel the delivery of the records to the legal officer. *Commonwealth* v. *Athearn*, 3 Mass. R. 285.

This suit is carried on in the name of the parish ; but whether by their authority, will be determined in the examination of the main questions which have been brought before us. And although it may not be necessary to the determination of the suit to decide all of them, yet as they are interesting to the parties, we propose to consider them in the order in which they were discussed.

The pivot on which the cause must turn, is the right of the defendant to hold the office which he claims. If he is the clerk of the parish, he has a right to the possession of the records. If he is a mere usurper, the parish may recover the records out of his hands. In order to investigate this subject it will be necessary to examine the proceedings of the parish n the years 1837 and 1838.

The legality of the election of parish officers in 1836, and of the meeting for the choice of the same officers in 1837, is unquestioned. The members of the parish were duly convened at the meetinghouse and, in the election of moderator, the old clerk (the only person having the legal right) presided. The moderator having been chosen, the meeting proceeded to the election of a clerk and other parish officers.

On the day of election, and just before the meeting was

First Parish in Sudbury *v.* Stearns.

opened, sixty-three persons, who resided within the territorial limits of the parish, but were not before members of this or any other religious society, filed with the clerk a certificate dated five days before, expressing their desire to join the parish and requesting him to enroll their names as members thereof.  They were present at the meeting and claimed the right to vote.  This was objected to, but their votes were received.  And thereupon fifty legal voters of the parish withdrew and organized a meeting at a public house near by and made choice of the usual parish officers.

Several questions arise, which have been fully argued and will now be examined.  1. Were those sixty-three persons entitled to vote ?  2. If not, was the election void and a nullity, so as to warrant another and separate organization of the parish ?

The most important and interesting question is whether the persons who filed their certificate, thereby acquired a right to vote.  Did these sixty-three inhabitants of the parish become members of the corporation by making known to the clerk their election and desire to become members ?  This must depend upon the construction of the 4th and 5th sections of the 20th chapter of the Revised Statutes.  The *fourth*, after pointing out the mode in which the members of any parish or religious society may leave it, provides that " no person shall hereafter be made a member of any parish or religious society, without his consent in writing."  The fifth section authorizes " every parish and religious society " to " make by-laws prescribing the manner in which persons may become members thereof."

This chapter of the Revised Statutes, and the former statutes of which it is a revision, together with the amendment of the 3d article of the bill of rights, have made essential alterations in our laws in relation to parishes, religious societies and the support of public worship.  The whole policy and course of our legislation upon this important subject, have undergone a radical change.  Formerly it was a fundamental principle that every person should contribute towards the support of public worship somewhere, be a member of some religious society ; and that he never could leave one but by joining another

Now no one is bound to attend, or support, public worship ; no one need be a member of any religious society, and any one may leave one society without joining any other. It is all voluntary and optional.

Territorial parishes are now placed on a perfect equal'ty with poll parishes. They have no advantages and are subject to no disabilities. The laws regulating the admission of members equally apply to all parochial incorporations, and to all individuals. They are also reciprocal and explicit. No person can be made or become a member of any such corporation, without his consent, and that too evidenced by a written application. So on the other hand no person can thrust himself into any such body against its will. The authority to prescribe the mode of admitting members, necessarily implies the power of determining whether they shall be admitted or not. This power may be exercised by a direct vote of the parish, or by proper by-laws be delegated to a committee or certain officers of the society. The relation of a member to a parish is founded on contract ; and can be created in no way but by the agreement of the parties. Any person wishing to become a member, must express his wish in writing, and the society, by a direct vote or by the act of an authorized agent, must accede to the application. Then the agreement is complete, creates the membership, and gives a right to vote and take part in the proceedings of the society. The case of *Osgood* v. *Bradley*, 7 Greenl. 411, does not militate against our view. That turned upon the construction of a statute which is essentially different from the one before us. *Leavitt* v. *Truair*, 13 Pick. 111.

In the case at bar the certificate of the sixty-three individuals constituted a regular application for admission, which the parish might accede to or reject. But they had not acted upon it, and until they agreed to receive the applicants they did not become members and had no right to vote.

We are next to inquire what effect the intrusion of these illegal voters into the meeting, had upon the proceedings of the parish. And it is very obvious that it did not render them illegal or justify its members in withdrawing. The presiding officer should have excluded their votes. But the receipt of

*Margin:* First Parish in Sudbury *v.* Stearns.

First Parish
in Sudbury
     v.
Stearns.

illegal votes did not necessarily vitiate the proceedings. If the moderator acted corruptly, he should be prosecuted. The intruders too would be liable to punishment for illegal voting. If the unlawful votes changed the majority, then the persons having a majority of lawful votes, by a proper process might be placed in office, instead of those declared to be elected. But the meeting being legal in its inception, the legal voters could maintain their rights in no way but by remaining and exercising their elective franchise. This would have enabled them to contest the election of the officers chosen, and if they had not a majority of the legal votes, to remove them and put in their places those legally chosen.

The cases referred to by the defendant's counsel are decisive on this point. If necessary, many more might be added to them. The principle which runs through them all, and is founded in common sense, as well as supported by authority, is, that a majority of the legal voters, who choose to vote, always constitutes an election. It has been holden, that when a majority expressly dissent, but do not vote, the election by the minority is good. *Oldknow* v. *Wainwright*, 1 Wm. Bl. 229. And in *Rex* v. *Foxcroft*, 2 Burr. 1017, Lord *Mansfield* says, and it was the exact point adjudicated, " the protesting electors had no way to stop the election, when once entered upon, but by voting for some other person than S, whereas they had only protested against any election at that time." " Whenever electors are present, and dont vote at all, they virtually acquiesce in the election made by those who do." In *Rex* v. *Withers* (referred to by *Wilmot* J in *Rex* v. *Foxcroft*) there were eleven electors, six protested against proceeding and did not vote ; the candidate receiving the other five votes was declared to be duly elected, and the court held that the six virtually consented to his election.

It is no objection to an election, that illegal votes were received, unless the illegal votes changed the majority. The mere fact of their existence never avoids an election. This is so plain a proposition that it needs no authority to support it. It is the principle adopted and acted upon in all cases of contested elections, whether in the British parliament, the congress of the United States, the legislature of this or any

other of the United States. The burden of proof too is always upon the persons contesting the election.

In *Ex parte Murphy*, 7 Cowen, 153, it is laid down that it must be made to appear affirmatively that the persons whose election is contested, received a number of illegal votes which, if rejected, would have reduced them to a minority : " The mere circumstance that improper votes were received, will not vitiate the election. If this were otherwise, hardly any election in the State could be sustained." Angell & Ames on Corp. 72.

There is nothing in this case which shows or has any tendency to show that the officers elected in March, 1837, had not a majority of the legal votes actually given. Indeed it is unquestioned that they had ; and upon the principles above stated, they were duly elected.

The next annual meeting, which was holden in March, 1838, was duly called by the proper officers, and its proceedings were legal. Indeed, we can discover no valid objections to any of the subsequent meetings called by the officers elected as aforesaid. In examining these proceedings it does not appear that the present suit ever was authorized by the parish. But at a meeting holden April 9, 1838, it is expressly disavowed.

It is apparent from the above view of the case, that the meeting holden at the public house by the members of the parish who withdrew from the meetinghouse, and the several meetings afterwards held by virtue of warrants issued by a justice of the peace, were illegal and invalid. The fifty who seceded clearly mistook their rights. If they had remained and voted for officers who had received a majority of the legal votes, those officers would have been entitled to the offices to which they were thus chosen. And had others been elected by the votes of the sixty-three intruders and entered into the offices, they might have been removed and the rightful officers put into their places, by the proper process for that purpose.

But while they were exercising the functions of their offices, being in *colore officii*, they would be officers *de facto*, and their acts and proceedings would be valid as to third persons. Their right to hold their offices could only be tried in an information

<div style="margin-left:0">
First Parish<br>
in Sudbury<br>
<i>v.</i><br>
Stearns.
</div>

in the nature of a *quo warranto* or on a writ of *mandamus* *Trustees of Vernon* v. *Hills*, 6 Cowen, 23.

There are two cases only in which a justice of the peace may issue a warrant for calling a parish meeting. The one is, when the assessors or committee unreasonably refuse to call one. The other is, where there are no assessors or committee qualified to call one. Revised Stat. *c.* 20, § 17. Upon the happening of the one or the other of these events, depends the justice's authority to act. They are conditions precedent and without them he has no jurisdiction. His warrants are a nullity. In this case neither of the contingencies occurred. There were, during all the time, not only officers *de facto* but *de jure*. There never were any vacancies to fill. These officers never unreasonably refused to call a meeting. There can be no unreasonable refusal without a request. And here does not appear to have been any request.

On the whole, we are of opinion that this suit in the name of the parish, was never authorized by that corporate body, but has been expressly repudiated by it. And that the defendant, being the legal clerk of the parish, has a right to the custody of the records.

<div style="text-align:right"><i>Plaintiffs nonsuit</i></div>